UNITED STATES DISTRICT COURT For Online Publication Only
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff

      -against-

LAWRENCE AVIATION INDUSTRIES, INC.,
GERALD COHEN, and ONE HUNDRED
TWENTY-FIVE ACRES OF LAND, MORE OR LESS,
LOCATED CONTINGUOUSLY OFF SHEEP
PASTURE ROAD, PORT JEFFERSON STATION,
NEW YORK,

              Defendants.
----------------------------------------------------------------------x

**MEMORANDUM & ORDER**
06-CV-4818 (JMA)(AYS)

**FILED**
**CLERK**
3/19/2019 4:47 pm
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

## I. INTRODUCTION

The United States of America ("United States" or the "Government") commenced this action on September 6, 2006 asserting five claims for relief pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §9601 *et seq.* The United States seeks: in Claims 1 and 2, recovery of response costs incurred by the Environmental Protection Agency ("EPA"), *in personam* against defendant Lawrence Aviation Industries, Inc. ("LAI") and defendant Gerald Cohen ("Cohen"), respectively, pursuant to CERCLA § 9607(a); in Claim 3, recovery of the costs incurred by the EPA *in rem* against defendant One Hundred Twenty-Five Acres of Land pursuant to CERCLA § 9607(l), and; in Claims 4 and 5, the imposition of civil penalties for failure to respond to a request for information against LAI and Cohen, respectively, pursuant to CERCLA § 9604(e). Complaint, Docket Entry ("DE") [1].

Subsequent to the filing of the complaint, eleven *in rem* claimants (collectively, the *In Rem* Claimants") have appeared and filed claims of interest in defendant One Hundred Twenty-Five Acres of Land: New York State; Long Island Lighting Company d/b/a LIPA and KeySpan Gas

East Corporation d/b/a KeySpan Energy Delivery Long Island (collectively "KeySpan"); the County of Suffolk; Waste Management New England Environmental Transport, Inc.; Maryhaven Center of Hope, Inc.; St. Charles Corporation; North Shore Jewish Center; Merrill Lynch Business Financial Services Inc.; Lawrence Aviation Industries 401(k) Plan; Mary Hines; and Howard Hudson.[1] The *In Rem* Claimants assert an interest in the defendant property as a means to enforce various asserted liens against LAI and/or Cohen and seek to establish the priority of their liens against each other and against any liens of the United States.

## II. PROCEDURAL HISTORY & TRIAL PROCEEDINGS

United States Senior District Judge Leonard D. Wexler presided over this matter during the months directly preceding the trial and at trial.[2] The Government moved to bifurcate the trial to hear claims 1, 2, 4, and 5 first, and hear claim 3 only if the Government prevailed on claim 1 and/or 2. That motion, which was unopposed, was granted by Judge Wexler on April 25, 2017. At a pretrial conference held on September 6, 2017, Judge Wexler vacated the order granting bifurcation, ruling that "all issues will be presented during the trial." Minute Entry, DE [181]. A bench trial was held on February 1-2 and 5, 2018 before Judge Wexler. The Government addressed its entitlement to liens in relation to Claim 3, but no testimony or other submissions was received from the *In Rem* Claimants.

At the trial, six witnesses testified for the United States and over 60 exhibits totaling in excess of 11,000 pages of documents, reports, and photographs were introduced into evidence by the Government. Defendants stipulated to the admission of these exhibits. Cohen was the sole

---

[1] Two additional claimants, Global Home Group, LLC and JPEC Land Developments, appear as "pro se" on the docket. Their counsels' motion to withdraw was granted on February 11, 2011, at which time these claimants were advised that they must appear by counsel. Order, DE [124]; *see also* Elec. Order of 5/31/2011.

[2] District Judge Joseph F. Bianco was the assigned judge from the case's inception in 2006 until November 7, 2016 when he recused himself from the matter.

witness to testify on Defendants' behalf, and no documentary evidence was submitted by Defendants.

Judge Wexler passed away during preparation of post-trial briefing, and the case was re-assigned to this Court on April 5, 2018. Pursuant to Rule 63, the parties were consulted regarding whether either party wished to recall any witnesses. During a telephone conference held on July 10, 2018, the parties agreed to rely on the trial record without further testimony. Upon review of the record, I certify familiarity with it, and determine that the case may be completed without prejudice to the parties. Accordingly, the purpose of this decision is to provide my Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52.

## III. FINDINGS OF FACT

The evidence admitted at the trial is largely undisputed.[3] The EPA's evidence, both testimonial and documentary, is comprehensive and thorough. Its witnesses are well-qualified and knowledgeable, and the voluminous exhibits were admitted without objection. Defendants' evidence was presented only through the testimony of Cohen without any documentary support. His background does not demonstrate any qualification to speak generally to environmental hazards or cleanup efforts, and thus he was constrained to testifying only about the events that occurred at LAI. On that subject, his limited attempts to contradict liability were based on his own views and beliefs, and were unsupported by any expert opinions. In addition, the Defendants' response, DE [201] ("Defs' Resp."), to the Government's proposed Findings of Fact and Conclusions of Law, DE [195], is limited to a few discrete issues. The Findings of Fact set forth below are undisputed unless otherwise indicated.

---

[3] References to the evidence are to the trial transcript of proceedings ("Tr.") and the Government's exhibits ("GX").

## A.  The Site

Cohen is the President and CEO of LAI, and since his father's death in 1982, is LAI's sole shareholder.  The case implicates several lots of real property owned by LAI and/or Cohen off Sheep Pasture Road in Port Jefferson Station, New York.  The parties have stipulated to the ownership of the lots.  LAI is the owner of real property shown on the Suffolk County tax map as Section 159, Block 2, Lot 19 ("Lot 19"), Section 136, Block 2, Lot 22 ( "Lot 22"), and Section 159, Block 1, Lot 26 ( "Lot 26").  LAI acquired Lots 19 and 22 on April 30, 1959, and acquired Lot 26 on July 27, 1967.  Cohen is the owner of real property shown on the Suffolk County tax map as Section 180, Block 4, Lot 1 ("Lot 1"), Section 180, Block 4, Lot 2 ("Lot 2"), and Section 159, Block 2, Lot 20 ("Lot 20").  Lot 1 was previously owned by LAI and was acquired by Cohen on October 2, 1989.  Cohen acquired Lots 2 and 20 on January 23, 1984 from his mother, Rita Cohen.  LAI's operations were conducted of Lots 1, 2, 19, 20, 22, and 26, which are contiguous (collectively, the "LAI Facility").  Defendants LAI and Cohen conducted titanium sheet metal manufacturing operations at the LAI Facility, mostly for the aeronautics industry, from 1959 to approximately 2004.  GX 1(k) at US 00021358-59.  In 2008, Cohen, individually and on behalf of LAI, pled guilty to storing hazardous waste without a permit at the LAI Facility.  *See United States v. Cohen,* 06-CR-0596, DE [46].  Cohen was sentenced to a term of imprisonment and was ordered to pay restitution, jointly and severally with LAI, in the amount of $105,816.00.  *Id.*  DE [68].

The Superfund Site ("LAI Site"), which was placed on the National Priorities List ("NPL") effective March 6, 2000, includes the LAI Facility as well as the areas where hazardous substances and/or pollutants and contaminants released at the LAI Facility have come to be located.  *See* GX 58; GX 59.  The LAI Site includes areas affected by a contaminated groundwater plume moving

downgradient and north of the LAI Facility towards Old Mill Pond, Old Mill Creek, and Port Jefferson Harbor. GX 1(k) at US 00021367. Among the hazardous substances found at the LAI Site are trichloroethylene ("TCE") and polychlorinated biphenyls ("PCBs"), both known carcinogens. *Id.* at US 00021372.

The LAI Site sits above the Upper Glacial Aquifer, the Magothy Aquifer, and the Lloyd Aquifer. GX 1(k) at US 00021364. These three aquifers are part of the Nassau/Suffolk County Aquifer that supplies Long Island with most of its drinking water. The groundwater in the vicinity of the LAI Site is not currently used as a drinking water supply because it is contaminated by TCE. Tr. 67:2-12.

**B. Investigative and Enforcement Activities**

Investigative and enforcement activities at the LAI Site began in the 1970s and have continued for four decades. Various agencies of both the state and federal government have been involved in those efforts.

1. Pre-EPA Activities at the LAI Site

The Suffolk County Department of Health Services ("SCDHS") and the New York State Department of Environmental Conservation ("NYSDEC"), were the first agencies involved with the LAI Site. Plaintiff offered the testimony of James Pim ("Pim"), Chief Engineer, Suffolk County Department of Health, now retired, to detail the involvement of Suffolk County and New York State at the LAI Site. Pim, who holds Bachelor's and Master's degrees in Civil Engineering, testified about his interactions with LAI and Cohen and discussed contemporaneous records that were admitted into evidence. SCDHS acted as field agents for the NYSDEC by conducting inspections, informing people of the state requirements, and trying to secure voluntary compliance with its recommendations. The SCDHS did not have enforcement authority, and in cases of non-compliance, it would submit a case report to NYSDEC for it to take action.

The earliest documented contact between SCDHS and LAI is a letter dated January 4, 1971 directed to the attention of Cohen and detailing necessary changes to an environmental analysis report submitted by LAI. *See* GX 37. Cohen, as LAI's General Manager, responded to that letter. *See* GX 38. Pim testified that he began interacting with LAI on Suffolk County's behalf in 1972. He met with Cohen to discuss potential discharge violations at the LAI Facility. Pim wrote to Cohen on January 16, 1973 to discuss LAI's proposed pollution abatement program, noting his disappointment "at the leisurely approach that you seem to be taking in this matter." GX 39. Pim requested that LAI stop discharging liquid waste to the ground by February 15, 1973. Cohen also signed waste disposal permits on behalf of LAI in March 1973. *See* GX 40.

Suffolk County continued to conduct inspections including a series of aerial photographs taken by a police photographer from a police helicopter in May 1980. Pim confirmed that the pictures accurately depict the condition of the site, including a very large number of 55-gallon drums left in the open. *See* GX 1(e) at US 00016604. Pim testified that in terms of the number of drums, this was the largest accumulation he had seen in one place in Suffolk County. The photographs show drums strewn haphazardly throughout the property as well as two "lagoons" or leaching ponds that are not naturally occurring, but rather contain water and discharge. Upon sampling, many of the drums were found to contain strong acids, bases, and metallic sludge. There was discharge from these drums onto the ground.

In July 1980, Suffolk County conducted a further inspection, and additional photographs were taken that showed the poor condition of the drums. *See* GX 44. Cohen participated in the inspection. In August 1980, Pim sent LAI a copy of a memo covering what was observed during the July inspection and providing a list of suggested work that LAI needed to perform to be compliant with pollution control laws. GX 43. The suggestions included, *inter alia*, pumping out liquid from the drums and removing them, pumping out and scraping the lagoons, removing and rebuilding underground tanks, removing contaminated soil, and rebuilding all systems to comply

with state and local requirements. *Id.* Pim stated that recommendations to remove liquids or residue were not followed by LAI because the liquids were still there when subsequent inspections were conducted.

Instead of pumping out and removing many drums, LAI crushed full drums by piling them together with a crane and front-end loader, then rupturing the drums and allowing the liquid and sludge to flow out of them and onto the ground. Pim met with Cohen and other LAI employees and advised them not to crush full drums because it would cause groundwater pollution. SCDHS estimated that more than 1,600 drums were crushed into the ground. GX 2(c) at US 00015627-28.

SCDHS took samples from several areas at the LAI Facility in the fall of 1980. The test results indicated impermissibly high levels of hazardous material, including TCE. SCDHS issued Notices of Violation on December 4, 1980 advising LAI that it was in violation of the New York State Environmental Conservation law. *See* GX 46. In 1981 or 1982, LAI hired a company called Safety Kleen to remove and dispose of the solvents. SCDHS discontinued its inspections at the LAI Site in 1982 after it was denied access by Cohen's attorneys. Tr. at 49.

Further inspections were conducted by the NYSDEC. In the late 1980s, private wells on residential properties adjacent to the LAI Facility were found to be contaminated with, *inter alia,* TCE, fluoride, nitrates and heavy metals. GX 1(k) at US 00021359. At a later date, residents were provided with bottled water and subsequently their homes were connected to public water supplies. A NYSDEC investigation in July 1990 discovered over 2,000 drums stored at on-site, and LAI was cited for violating hazardous waste regulations. *See* GX 1(b) at US 00016052. In 1991, the NYSDEC oversaw a major drum removal action from the LAI Facility. In 1997, NYSDEC conducted a limited Remedial Investigation, the results of which revealed contamination of groundwater and surface water by elevated concentrations of chlorinated volatile organic compounds. In August 1999, the NYSDEC formally requested that the LAI Site be added to the

NPL.  The NYSDEC made the request because its continued investigation of the site was thwarted by lack of access to the site at the direction of Cohen.  Tr. at 76.

### 2.  EPA Investigation

The introduction of documentary evidence regarding the EPA's early involvement at the LAI Site was through the testimony of Salvatore Badalamenti ("Badalamenti"), Chief of the Eastern New York Remediation Section of the EPA.  As Section Chief, he oversees approximately 50 hazardous waste sites.  Badalamenti holds a Bachelor's degree in Civil Engineering and a Master of Science degree, and has had formal training in groundwater pollution, hydrogeology, subsurface monitoring technology, hazardous materials incident response, and facilities planning for wastewater drainage works.  Prior to becoming chief of the section, Badalamenti was a Remediation Project Manager ("RPM") for the LAI Site, and prior to assuming his responsibilities at LAI, Badalamenti had responsibility for the cleanup of hazardous substances, including TCE, in groundwater, soil, sediment and surface water at other sites.  Badalamenti was involved with the LAI Site for almost fifteen (15) years. He identified Cohen as LAI's point of contact with the EPA in connection with environmental matters and the clean-up, and testified that the EPA routinely provided Cohen with split samples for testing for hazardous substances.

In response to NYSDEC's request, EPA prepared a Hazard Ranking System package for the LAI Site in accordance with CERCLA and its regulations.  The EPA found that there had been a release of hazardous substances at the LAI Site, most notably TCE, which had been released from the LAI Site to groundwater and was likely to migrate to the Upper Glacial and/or Magothy Aquifers.  On October 22, 1999, EPA proposed the LAI Site for inclusion on the NPL, and the LAI Site was subsequently placed on the NPL, effective March 6, 2000.

### a. Notices and Request for Information

By letter dated April 12, 2000, the EPA notified LAI that it was a potentially liable party with respect to the LAI Site, and also requested that that LAI carry out a Remedial Investigation/feasibility study under the EPA's oversight. GX 4(a). On April 3, 2003, the acting Director of the EPA Emergency and Remedial Response Division issued a letter to LAI and Cohen that served several purposes. *See* GX 4(c). By this letter, the EPA informed Cohen that it had reason to believe that Cohen, as owner or operator of the LAI Site, may individually be a potentially responsible party. It further advised Cohen about liens perfected against parts of the property and provided him with procedures for challenging them.

The letter also referenced and attached a request for information pursuant to section 104(e) of CERCLA. *See* GX4 (c) at US 00021940-50 ("104(e) Request"). The 104(e) Request sought specific information about, *inter alia,* the identification and location of any known releases of hazardous substances. The April 3, 2003 letter advised Cohen that compliance with the 104(e) Request is required by law and that failure to comply could result in civil penalties. Despite follow-up letters from EPA dated June 23, 2003 and August 8, 2003, Cohen failed to provide a written response to the 104(e) Request. Cohen provided limited answers to some questions at a deposition held pursuant to an administrative subpoena in December 2003, but provided no information regarding the location of releases of hazardous substances at the LAI Facility.[4]

Based upon its communications with LAI and Cohen in 2003, EPA determined that LAI and Cohen were not willing or able to carry out the necessary investigations at the LAI Site.

---

[4] In November 2010, Cohen told EPA representatives for the first time that he was aware of the disposal of TCE in a floor drain of a building and that he had filled that drain with cement. An EPA official testified that if Cohen had timely disclosed this information, the EPA's efforts would have been concentrated on that source and it would have implemented the groundwater remedies sooner to prevent further migration of the TCE plume. Tr. 253-256.

Over the ensuing years, the EPA carried out various response and remedial activities including: a remedial investigation ("RI"), a feasibility study ("FS"), a proposed remedial action plan, a Record of Decision documenting the selection of a remedy, a remedial design of that remedy, the implementation of that remedy, and two supplemental removal actions. These activities were carried out in accordance with the National Contingency Plan ("NCP"), which comprises the implementing regulations for CERCLA and governs how the EPA conducts investigations and remediations at Superfund sites. The EPA provided oversight of its response action contractors, including CDM Federal Programs Corporation ("CDM") and its successor HDR, Inc. ("HDR").

### b. Stabilization Activities by the EPA

On December 9, 2003, Badalamenti, along with other EPA staff and contractors and NYSDEC representatives, conducted an inspection of the LAI Facility and took photographs. They discovered numerous conditions of concern including, *inter alia,* leaking and corroding drums, unsafe stacking of the drums, an aboveground storage tank containing nitric acid that was "fuming with thin white smoke," and a tarp covered vat of sulfuric acid that was spilling over. *See* GX 2(a); Tr. 89-95. The presence of hydrofluoric acid on site, the exposure to which can cause tissue destruction resulting in limb loss or death, required enhanced protection protocols and emergency procedures to protect and/or treat field personnel. GX 2(c) at US 00015626-27.

The EPA determined that an emergency response was warranted "[b]ased on the conditions observed at the Site, the unstable way in which drums were staged, the generally poor condition of those drums and the structures that contain them, the spills noted throughout the facility and the history of releases which occurred at the Site." EPA Action Memorandum, GX 2(c) at US 00015628. On several occasions in December 2003 and January 2004, the EPA sought Cohen's consent to take emergency action at the LAI Facility, but Cohen would agree only to access for

sampling activities, not to allow the EPA to dispose of any of the materials.  GX 9 at US 00014675.

The EPA issued an Administrative Order Directing Compliance with Request for Access, *id.,* with

which Cohen complied.  The EPA conducted stabilization activities from January to May 2004 for

the purpose of securing the existing materials and reducing the threat of release of hazardous

substances.  The conditions addressed and remedial activities conducted are detailed in the EPA

Action Memorandum dated September 28, 2004.  GX 2(c).  During this initial stabilization phase,

the EPA inventoried approximately 1,552 drums, ten 3,000 gallon open vats of acidic and caustic

liquids, two 6,000 gallon above ground storage tanks, and approximately sixty small and large

transformers laden with PCBs.  GX 2(c) at US 00015630.  By March 2005, the EPA had disposed

of most of the drums and removed 13.5 tons of transformers and capacitors filled with PCBs.

### c. *Remedial Investigation and Record of Decision*

The Remedial Investigation ("RI") commenced in earnest in August 2003.  The

documentary evidence regarding the RI was introduced through the testimony of Demetrios

Klerides ("Klerides"), Project Manager at the LAI Site.  Klerides has a Bachelor's in civil

engineering, and a Master's in civil engineering specializing in environmental waste engineering.

He is a licensed professional engineer and board certified in environmental engineering.   He has

worked on approximately fifty-eight hazardous waste sites through his career.  Klerides worked

for EPA contractors CDM and HDR.   At time of trial, he was still Project Manager for LAI Site.

In preparing the RI, CDM reviewed the results of the prior investigations of both the

SCDHS and NYSDEC.  The information gleaned was used as a starting point for the EPA's

investigations.  The SCDHS and NYSDEC had installed monitoring wells at various locations near

where the drums were stored, but none had been installed directly at the LAI Facility because LAI

did not provide access to the regulatory authorities to go on the site.  TCE was found at three of

the wells designated MW-04, PJ-08, and PJ-11. Soil samples taken by SCDHS and NYSDEC had

also shown TCE releases at the LAI Facility and concentrations of TCE in Old Mill Pond. These earlier findings were used by CDM to determine where additional wells should be installed. The first wells were installed in 2003 or 2004, and additional wells were installed over time based on gaps in the data, and based on LAI's and Cohen's wish to investigate "other sources" of contamination. Tr. 174.

During the drilling of wells, the EPA created a soil boring designated as "7A" with the intention of drilling a well at that location. After collecting a groundwater sample, the EPA attempted to drill a well, but was unsuccessful when part of the pipe casing broke and could not be removed. That piping is still in the ground. The groundwater sample taken at that location came back clean. Tr. 182-84.

Two rounds of groundwater sampling were conducted at all of the EPA wells during the RI. CDM followed all EPA guidelines including those set forth in the Quality Assurance Project Plan for this particular project. Those procedures included how to handle samples as well as the proper procedures for placing wells. Klerides testified that these procedures were followed. In addition to water sampling, samples of soil, sediment, and surface water were also tested. The results of all the testing were made part of the record.

The delineation criteria for TCE is five parts per billion ("ppb"). Tr. 185. TCE in excess of five ppb was found in eight of the test wells, MPW-02, MPW-04, MPW-05, MPW-06, MPW-07, MPW-08, MPW-09 and MPW-10. *See* Figure 4-16, GX 1(h) at US 00019071. The results for MPW-07, which is located on the LAI Facility, showed concentrations of up to 1,200 ppb.[5] Klerides characterized this as the "mother lo[de]" of TCE contamination. Tr. 182:19-20. The other seven wells also showed elevated levels of TCE. Most of these wells are located north of

---

[5] The Government notes in its findings of fact that the transcript incorrectly states "100, 100 parts per billion" and point to the documentary evidence showing the true result to be 1,200 ppb. Defendants have not disputed this point, and the Court has reviewed the exhibit and confirms that the Government's representation is accurate.

the LAI Facility and downgradient. Several surface water locations, including those at Old Mill Pond and Old Mill Creek, were also found to have levels of TCE above the delineation criteria. *See* Figure 4-18, GX 1(h) at US 00019074.

A groundwater contaminant plume is a mass of water that contains contamination above the delineation criteria. CDM determined that there was a ground water contaminant plume at the LAI Site, commencing at the LAI Facility, continuing northwest, then north into Port Jefferson Harbor (the "TCE Plume"). Its size was originally estimated to be approximately 6,000 feet long north to south, and 1,000 feet wide east to west. Klerides testified that the original source of the TCE is the vicinity of the "mother lo[de]" found at MPW-07 on the LAI Facility. CDM investigated alternative sources for the TCE contamination found in the wells and found no evidence of other sources. CDM located some wells to verify that there were no additional sources of contamination.

The final RI report was issued on March 6, 2006. Upon completion, CDM began preparation of a Feasibility Study ("FS") to evaluate the extent of the contamination and provide alternatives to address it. At the same time, the EPA, with CDM's assistance, began work on a Superfund Proposed Plan ("Plan") for the LAI Site. The Plan, issued on July 1, 2006, sets forth the EPA's preferred remedy for the site. The Plan was made available to the public for review at several locations. A public comment period was set and extended, and a public meeting was held. Neither LAI nor Cohen commented on the Plan.

After completion of the FS and the Plan, the EPA issued its Record of Decision for the LAI Site. ROD, GX 1(k). The ROD analyzed various remedies and selected those remedies that "best satisfy the requirements of CERCLA" and "provide the best balance of tradeoffs among the remedial alternatives." ROD at 45, US 00021402. Separate response activities were selected to address the TCE plume and soil contamination.

The groundwater contamination remedy selected to address the TCE plume provided for the construction, operation and maintenance of two groundwater treatment systems located both on-property at the LAI Facility and off-property near Old Mill Pond. An additional groundwater remedy, in situ chemical oxidation ("ISCO"), was proposed. ISCO consisted of injecting a chemical oxidant at locations near the source of the TCE contamination to reduce the concentration of TCE and potentially lessen the overall cleanup time necessary. The ROD also called for long-term groundwater monitoring.

The remedy selected to combat the soil contamination provided for the excavation and off-site disposal of PCB-contaminated soil. The ROD noted that there was a possibility of vapor intrusion, a condition that may occur when a volatile organic compound such as TCE evaporates into a gas and migrates upwards into any structures above. Continued investigation of vapor intrusion into nearby residences was indicated, as was the examination of transformers located at the LAI Facility for leakage and cleanup. The ROD noted that an additional remedy for vapor intrusion might be necessary upon conclusion of that investigation.

In addition to the selection of remedies to address contamination at the LAI Site, the ROD identified risks posed by the contamination to human health and the environment. As to soil contamination, the ROD indicated that human health cancer and non-cancer risks were "below or within the EPA's acceptable risk ranges" for workers and off-Site residents, "with the exception of exposure to future child residents to LAI Facility soils which pose a potential for non-cancer hazards due to PCBs." ROD at 18, US 00021375. As to groundwater, the ROD stated that the contamination by TCE and other materials "exceed[s] regulatory requirements and pose[s] risks to human health through inhalation and ingestion and dermal contact." *Id.* at 19, US 0021376. It proposed protecting human health and the environment through various efforts such as restoring groundwater to potable levels and preventing or minimizing the

discharge of contaminated groundwater into Port Jefferson Harbor.

## C. Implementation of Remediation

### 1. Groundwater

Evidence regarding the groundwater remediation conducted at the LAI Site was introduced through the testimony of Maria Jon ("Jon"), who was Badalamenti's successor as RPM at the LAI Site starting in 2009. Jon has a degree in chemical engineering and has worked at the EPA since 1985. She was still RPM at the LAI Site at the time of trial and had overseen various remediation actions taken at the Site by various EPA contractors.

Construction of the on-property groundwater extraction and treatment system commenced in December 2009, and it became operational in December 2010. Periodic testing done since the system began functioning shows that it is effective and that concentrations of TCE in the groundwater have decreased. Source contamination is being contained by the on-site extraction wells. The on-site system is operating in accordance with the ROD.

The ISCO injection system was also implemented on-site through construction of a series of thirteen injection wells at locations with high TCE concentrations. The ISCO treatment was implemented in August 2010 and is projected to reduce the duration of the on-site treatment system by ten years, from thirty years to twenty years. The ISCO system was implemented in accordance with the ROD and is working as designed.

The off-property "pump and treat" facility was installed near Old Mill Pond and is intended to capture and treat contaminated groundwater before it reaches the harbor. Construction began in October 2010 and operations began in August 2011. Early testing demonstrated that adjustments to the off-property system were necessary, and it was upgraded to expand the capture zone and increase flow capacity. GX 29 at US 00012405. Testing shows a decrease in the groundwater concentration of TCE, and the off-property treatment system is operating in accordance with the ROD.

The groundwater treatment remedy has resulted in a decrease in the plume size. As of 2012, over 1,000 pounds of contaminant had been removed from the ground. Sampling occurs annually, and it is the EPA's intention to treat the groundwater at the LAI Site to the point that the water can again be used as part of the drinking water supply.

2. Soil

Terry Kish ("Kish"), the EPA's on-scene coordinator at the LAI Site beginning in 2009, testified regarding the soil remediation by excavation performed at the site. Kish has a Bachelor's of Science degree in Geoscience and has worked in the environmental science field for almost twenty years.

In January 2009, soil excavation to remove PCB contaminated soil in the drum crushing area began. Excavation was suspended in April 2009 when lead was detected, requiring a more costly disposal method, but was resumed in September 2009 and completed later that fall. The recharge basin was also excavated in August 2009.

Twelve additional areas of concern were identified around the property. These areas developed as the result of an earlier, incomplete remediation effort conducted by NYSDEC during which contaminated soil was piled on concrete pads and covered by tarps. Over time, the tarps deteriorated, allowing the contaminated soil to migrate off the pads. Eleven of the sites had to be excavated due to PCB contamination. That remediation took place between 2009 and 2014. Counting the drum crushing area, recharge basin, and the additional areas of concern, approximately 18,000 tons of PCB-contaminated soil were excavated and removed from the LAI Site.

EPA identified thirty-one electrical transformers at the LAI Facility that required evaluation. GX 24 at US 00025184. Inventory and sampling was performed in August and September 2009. Seven transformers were found to contain PCB concentrations above applicable regulatory limits, three of which were leaking into steel containment pans. The leaking

transformers were drained of PCB-contaminated fluids, and the fluids, leaking transformers, and debris generated from the removal process were shipped off-site for disposal. The ROD goals established for transformers have been met.

### 3. Soil Vapor Intrusion

Based on factors such as the shallow depth to groundwater, the concentration of chemicals, and the proximity of residences to the plume, the EPA determined in 2006 that a vapor intrusion investigation was warranted. GX 12 at US 00025462. Sampling was taken at homes located within the contours of the TCE plume where the groundwater was within 100 feet of the surface. Sampling was also taken at Port Jefferson High School. Analysis of the samples established vapor intrusion into three homes and at the High School, specifically in the wrestling room. The EPA installed soil vapor mitigation systems at these locations, which are inspected annually.

Jon fields phone calls from residents and prospective buyers who are concerned about soil vapor migration in their homes. She communicates prior test results and arranges testing if a home is within the plume contours and has not been previously tested. She also allays the concerns of parents of high school children, advising them that there no air quality issues as long as the vapor system is operating. Tr. at 251. The Town of Brookhaven passed an ordinance for new construction requiring soil vapor intrusion testing before issuance of a certificate of occupancy.

### 4. Asbestos

During site assessment activities in September 2009, EPA noted a white fibrous material on a furnace and a machine in the Building G or "Drop Hammer" Building. GX 3(c) at US 00021643. Four samples were collected and analyzed, and two of the four were found to be asbestos containing material ("ACM"). In May 2013, Kish noticed that the insulation with ACM had deteriorated further. Kish pointed out the asbestos to Cohen, advised him of the results of the earlier testing, and told him that the presence of asbestos was an additional environmental hazard that needed to be addressed.

In December 2013, Kish observed a crew conducting a scrap metal salvaging operation in the Drop Hammer Building. The crew was using a large hydraulic excavator to tear out piping, which was then cut using acetylene torches. The asbestos-containing insulation was then dragged throughout the building and outside. Kish spoke to the crew leader, Tom Datre, and learned that they were working for Cohen.[6] Kish verbally directed the contractor, Datre Family Farming, to stop work. He followed up with a detailed e-mail to Cohen setting forth Kish's observations regarding the dispersal of ACM and requesting that various actions be taken prior to the resumption of salvage operations including the hiring of a licensed asbestos abatement contractor. GX 22. A licensed contractor was hired by Cohen, and that company performed emergency cleanup at the affected areas and erected containment barriers at the entrances to the Drop Hammer Building and another building. In March 2014, EPA learned that the containment barriers had been breached. It initiated an emergency removal action to stabilize the buildings followed by removal of ACM. Emergency field activities were completed in August 2014, and the cleanup of asbestos was completed in February 2015.

**D. Scope of Remediation and CERCLA Liens**

EPA has liens pursuant to CERCLA against the six parcels of property owned by LAI (Lots 19, 22, and 26) and Cohen (Lots 1, 2, and 20) comprising the LAI Facility. The liens against Lots 19 and 26 were recorded with the Suffolk County Clerk on March 6, 2003; the liens on the remaining lots were recorded on May 11, 2005. All six of the parcels were implicated in EPA's investigation and remediation efforts. Investigations included focus on discrete areas throughout the parcels including the drum crushing area spanning Lots 1 and 19, the lagoon on Lot 26, the

---

[6] The EPA states that it learned that the salvage operation was commenced to help pay restitution ordered against Cohen in the criminal proceeding. According to the EPA report, the U.S. Attorney's Office for the Southern District of New York had discovered that Cohen had been liquidating LAI assets and not using the proceeds to satisfy the restitution order. GX 26 at US 00025085. The Southern District's Financial Litigation Unit "issued restraining notices to Cohen, Datre, and Mid-Island Recycling who had been accepting the scrap metal." *Id.*

ditches on Lots 1 and 2, the sand pit area on Lot 22, the dumping area on Lot 2, and the cleared area on Lots 2 and 20.  Sample drilling was performed on all lots, and sampling results revealed elevated levels of contaminants on each lot.  The EPA in the RI concluded that metal concentrations above delineation criteria were widely distributed in soils in in all six parcels. Extensive groundwater investigations were conducted on Lots 19 and 26.

Response activities occurred on all six parcels as well.  These include: drum, asbestos, and PCB transformer stabilization and removal from Lot 19; excavation and removal of PCB-contaminated soil on Lots 1, 19, and 26; implementation of a groundwater treatment system on Lot 26; soil boring locations on all six.   EPA began incurring response costs in 1999 and sent written notices of potential liability to LAI on April 12, 2000 and to Cohen on April 3, 2003.  GX 4(a) and 4(c).

## E.  Defendants' Testimony on Liability

Cohen was the lone witness for Defendants.  He holds a degree in business administration from M.I.T.  There is no indication that he has any formal training in any other disciplines such as chemical or civil engineering, geology, or hazardous waste management. He has been President and CEO of LAI since 1982.  In 2009, Cohen pled guilty to storing hazardous waste without a permit at the LAI Facility.  As part of his plea allocution, Cohen stated that from April of 2001 through July 17, 2003, he knowingly stored waste material at LAI, that the waste material was hazardous material, that the storage was done without a permit, that the waste material had a potential harmful effect to the environment or others, and that he knew or had reason to know that the waste material had a potential to be harmful to others or to the environment.  Tr. at 365-66. Cohen was sentenced to a term of imprisonment of one year and one day, and was ordered to pay

restitution, jointly and severally with LAI, in the amount of $105,816.00 payable to the EPA.  *See*
GX 57, Judgment in *United States v. Cohen,* 06-CR-0596.[7]

Defendants contest four points of fact as to liability:  (1) that the EPA or its contractors
caused groundwater contamination by negligent drilling that forced contaminants into the water
table; (2) that any problem at Port Jefferson High School was separate and distinct, having nothing
to do with LAI; (3) that the asbestos issue was caused by a contractor who was told by Cohen not
to come onto the LAI premises and did so anyway; and (4) that he was a Government contractor
required to use TCE to clean parts manufactured for the Government and should not be held
accountable by the Government for any resulting contamination into the groundwater.   The Court
has reviewed these points and finds that they do not change or otherwise affect the Findings of
Facts set forth above in sections III.A through D.

Defendants contentions, raised in their Response to the Government's proposed Findings
of Fact, consist of conclusory statements in one or two sentences with a citation to only Cohen's
testimony.  The arguments that the EPA itself caused groundwater contamination by negligent
drilling and that there is some alternative cause of vapor intrusion at Port Jefferson High School
are merely unsubstantiated theories unsupported by any expert testimony.  Cohen does not propose
an alternative cause of the pollution at the high school, but simply states his belief that it was not
caused by LAI.

Defendants' argument about the asbestos issue is similarly short on factual support.  Kish
testified in detail about his observations of the salvage work being performed and his conversations
with Datre, the crew leader, about having been hired by Cohen, and with Cohen.  Cohen states
only that "the contractor," presumably Datre, came on the premises without permission.
Defendants did not provide an affidavit from Datre or any documentary evidence to support his

---

[7]While Cohen's criminal conviction is evidence of his liability regarding the storage of hazardous
substances at LAI, the Court has not considered this fact as a basis for negating his credibility as a witness
in this case.

Cohen's statement.  Finally, Defendants suggest that since the Government "required" LAI to use TCE to clean the parts that LAI had manufactured for the Government, LAI "should not be held accountable by that very same Government."  Defs.' Response at 1.  Even assuming that the use of TCE was necessary, there is no evidence that the Government directed LAI to dispose of the chemical in some specific way.  Nor can Defendants support their position that LAI's role as a Government contractor somehow relieved LAI of its statutory obligations regarding the treatment of hazardous substances.  Any attempt to avoid liability in this manner fails.[8]

**F. EPA's Response Costs**

Through December 21, 2016, the United States has incurred $44,217,476.67 in unreimbursed past response costs for the LAI Site, plus $3,898,547.64 in interest.  The costs are derived from EPA's COMPASS accounting system, which summarizes costs incurred by site. The Financial Services Section generates reports using a program known as the Superfund Cost Organization Recovery Package Imaging and On-Line System ("SCORPIOS").  Evidence regarding the costs was introduced through the testimony of two witnesses, Christopher Stuart Osborne ("Osborne"), a licensed CPA from the EPA Office of the Controller, and Albert Benroubi ("Benroubi"), staff accountant with EPA in the financial management branch working exclusively on Superfund cost documentation.  Defendants did not introduce witnesses or testimony to dispute the cost figures or analysis put forth by the EPA.

EPA cleanup costs performed pursuant to CERCLA include both direct and indirect costs. Direct costs are those incurred by an organization directly associated with, or attributable to, a site. Examples of direct costs include salaries of EPA personnel at a site and costs incurred by contractors performing work at a site.  Indirect costs, also referred to as overhead costs, are costs that are not readily identifiable with a particular site, but which provide a benefit to the site.

---

[8] To the extent Defendants' argument that it is somehow insulated from liability as a Government contractor can be interpreted as an attempt to shift owner/operator liability, it is addressed further, below.

Osborne testified about EPA's accounting procedures in general. The federal government, including EPA, adheres to Statement of Federal Financial Accounting Standards No. 4 ("Standard 4"). Defendant did not raise any objection during the trial or after regarding the accounting principles and standards utilized by the EPA.

Tracking of both direct and indirect costs are required to satisfy Standard 4. Direct costs are tracked by the cost accounting system. The indirect costs attributable to a particular site are calculated using a methodology developed to allocate overhead costs to individual sites. The indirect cost methodology was evaluated by the Government Accounting Office and the private accounting firm KPMG prior to implementation and found to be appropriate and in compliance with Standard 4.

Applying the methodology by region, EPA pools all the indirect costs in that region and divides that number by the total direct costs incurred in that same region to determine a percentage rate to be used. That rate is then applied to the direct costs at a specific site to determine the indirect cost allocation for that site. The rate is calculated annually, resulting in a separate rate for each fiscal year. EPA's direct and indirect regional costs associated with programs other than Superfund are excluded from the methodology.

Benroubi testified about the SCORPIOS system and how the reports generated by the system comprise input from different sources such as contractor invoices. Each cost reflected in SCORPIOS was reconciled against an image of the appropriate documentation by an accounting technician. Benroubi then reviewed and verified the accuracy of each individual expense.

The indirect rate was applied to the direct costs in the SCORPIOS report to determine the proportion of regional indirect costs attributable to the LAI Site. From 2000 through 2016, the indirect rate for the region ranged from 23.46 % to 49.20%. GX 30 at US 00029800; GX 31 at US 00030046. Applying the appropriate rate each year, indirect costs for the LAI Site through May

2005 were $1,448,095.51, GX 30 at US 0029800, and indirect costs at the site from June 2005 through December 2016 were $10,589,686.06.  GX 31 at US 00030046.

Benroubi verified that total direct and indirect costs incurred at the LAI Site through December 31, 2016 were $44,217,476.67, plus interest in the amount of $3,898,547.64, GX 32, for a total of $48,116,024.31.

## IV.  CONCLUSIONS OF LAW

### A.  Claims 1 and 2:  Recovery of Response Costs

In Claims 1 and 2, the United States, pursuant to CERCLA §107(a), 42 U.S.C. §9607(a), seeks recovery from defendants LAI and Cohen of the response costs incurred, and to be incurred, by the EPA in connection with the release or threatened release of hazardous substances into the environment at the LAI Site.   CERCLA "created a new scheme of liability geared toward cleaning-up contaminated property as quickly as possible."  *In re Duplan Corp.,* 212 F.3d 144, 152 (2d Cir. 2000).   Its primary purposes "are axiomatic: (1) to encourage the timely cleanup of hazardous waste sites; and (2) to place the cost of that cleanup on those responsible for creating or maintaining the hazardous condition."  *Price Trucking Corp. v. Norampac Indus., Inc.,* 748 F.3d 75, 79 (2d Cir. 2014) (internal quotations and citation omitted).   CERCLA is construed liberally "to advance the dual goals of cleaning up hazardous waste and holding polluters responsible for their actions." *New York v. Next Millennium Realty, LLC,* 732 F.3d 117, 124 (2d Cir. 2013).  CERCLA authorizes the President to "remove or arrange for the removal of, and provide for remedial action relating to" the release or threat of release of a hazardous substance into the environment "which may present an imminent and substantial danger to the public health or welfare."   42 U.S.C. §9604(a)(1).

The United States now seeks to recover costs incurred for recovery actions taken by it. The statute providing for such recovery, section 107(a) of CERCLA, is a strict liability statute.

*United States v. Alcan Aluminum Corp. ("Alcan I")*, 315 F.3d 179, 184 (2d Cir. 2003). In addition, "[w]here the environmental harm is indivisible liability is joint and several." *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992). There are only three defenses, and those are available to a potentially responsible party who can prove by a preponderance of the evidence that both the release or threat of release and the resulting damage "were caused solely by—(1) an act of God; (2) an act of war; or (3) an act or omission of a third party other than an employee or agent of the defendant" if the defendant establishes certain facts regarding his own conduct. 42 U.S.C. §9607(b). None of these defenses have been raised by Cohen or LAI.

To recover costs under section 170(a), a plaintiff must establish that: (1) the site is a "facility" as defined by the statute; (2) there was a release or threatened release of hazardous substances at the facility; (3) defendant falls within one of the four categories of potentially responsible parties; (4) the plaintiff incurred costs in responding to the release or threatened release; and (5) the response and costs conform to the National Contingency Plan. *See Price Trucking,* 748 F.3d at 80; *Prisco v. A&D Carting Corp.,* 168 F.3d 593, 602-03 (2d Cir. 1999).

1. Facility within the Meaning of CERCLA

A facility is defined as, *inter alia,* "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. §9601(9)(B); *see also New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 n.15 (2d Cir. 1985) (noting that "CERLCA defines the term 'facility' broadly to include any property at which hazardous substances have come to be located"). As hazardous substances "came to be located" throughout the property, the LAI Facility is a "facility" within the meaning of CERCLA.

## 2. Release or Threatened Release of Hazardous Substances

Imposition of liability under CERCLA requires evidence of a release or threatened release of hazardous substances at the facility. A "release" includes:

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)

42 U.S.C. § 9601 (22). The term "hazardous substance" is defined by referencing other environmental statutes and means:

> (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C.A. § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 U.S.C.A. § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 U.S.C.A. § 2606].

42 U.S.C. § 9601 (14). Generally, there is no requirement that a threshold amount of a hazardous substance be released. *See, e.g., Murtha,* 958 F.2d at 1200 (noting that "[q]uantity or concentration is not a factor" unless expressly provided by Congress).

A non-exhaustive list of the hazardous substances found at the LAI Site include TCE, PCBs, hydrofluoric acid, sulfuric acid, nitric acid, and asbestos. 40 C.F.R. §302.4, Table 302.4. The evidence conclusively establishes that there was a release and/or a threatened release of hazardous substances. For example, the presence of corroded and leaking drums, leaking

transformers, and uncovered vats of caustic liquids constitute such a release. *See Shore Realty Corp.,* 759 F.2d at 1054 ("continuing leaching and seepage from the earlier spills, and the leaking drums all constitute 'releases' . . . [and] the corroding and deteriorating tanks . . . amount to a threat of release"); *New York v. Almy Bros., Inc.,* 866 F. Supp. 668, 676 (N.D.N.Y. 1994) (drums allowed "to deteriorate in such a way that the chemicals they contained 'might' enter the environment" constituted disposal).

Regarding the release of TCE, Cohen's conclusory testimony that LAI maintained TCE in self-contained units is undercut by the overwhelming evidence to the contrary. Cohen provided no proof to support his testimony that LAI used self-contained units prior to 1980, while LAI's own application for a State Pollutant Discharge Elimination System ("SPDES") permit in 1980 indicated that TCE was stored on-site in barrels. Testing consistently found evidence of TCE, starting from the earlier days of environmental intervention at the site when SPDHS documented unlawful concentrations of TCE in a leaching pool in 1980. GX 46.

3. Defendants as Responsible Parties

The potentially responsible parties enumerated by CERCLA include, *inter alia,* the current owner and operator of a facility, and any person who owned and operated a facility at the time of disposal of any hazardous substance. 42 U.S.C. §9607(a). Defendants are liable as owners and/or operators, both currently and at the time of the release of hazardous substances.

a. *Owner liability*

There are six parcels of property comprising the LAI Facility, of which three are owned by LAI, and the remaining three are owned by Cohen. "[S]ection 9607(a)(1) unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release,

without regard to causation." *Shore Realty Corp.*, 759 F.2d at 1044. Accordingly, both LAI and Cohen are liable as current owners.

Liability may also be imposed upon a person who owned the facility at the time of disposal of any hazardous substance. "Disposal" is defined to mean the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. §§ 6903(3), 9601(29). The Government refers to the entire property as the LAI Facility, consisting of 10 buildings located on the southern portion of the property where the manufacturing took place on Lots 19 and 26, and the "outlying parcels," consisting of Lots 1, 2, 20, and 22, to the northeast and east which are "mostly vacant wooded areas." *See* GX 1(h) at US 00018730; Tr. at 69-71. Although the introduction of evidence at trial was not always tailored to strictly correspond with the six Lot numbers, there is sufficient evidence to establish the presence of hazardous waste on each lot.

As to the LAI-owned lots, there is substantial evidence that disposal occurred at or around the LAI buildings, which were located on Lots 19 and 26. The drum crushing area was partially on Lot 19, the lagoon was located on Lot 26, and the sand quarry on Lot 22. PCB contaminated soil was excavated and removed from Lots 19 and 26, and asbestos and PCB transformer removal activity took place on Lot 19. Although the lots owned by Cohen were "outlying parcels," there is evidence of disposal in those areas as well. A portion of the drum crushing area and drainage ditches were located on Lot 1, and soil contaminated by PCBs was also removed from this location. Drainage ditches and a dumping area existed in Lot 2. In addition, sample drilling conducted on all the lots discovered elevated levels of contaminants in the soil on all six parcels.

### b. Operator liability

Potentially responsible parties also include the operator of the facility, both currently and at the time of the disposal of hazardous substances. Clearly LAI was an operator of the facility throughout its history. The remaining question is whether operator liability can also be imposed on Cohen. The Court finds that it can.

The Supreme Court has determined that under CERCLA, "any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution ... regardless of whether that person is the facility's owner [or] the owner's parent corporation." *United States v. Bestfoods*, 524 U.S. 51, 65, 118 S. Ct. 1876, 141 L.Ed.2d 43 (1998) (internal citations omitted). An "operator" is defined as "someone who directs the workings of, manages, or conducts the affairs of a facility." *Id.* at 66. To operate means "something more than mere mechanical activation or pumps and valves." *Id.* at 71. For CERCLA liability to attach, an operator must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66–67; *see also AMW Materials Testing, Inc. v. Town of Babylon,* 584 F.3d 436, 444 (2d Cir. 2009) (*Bestfoods'* "sharpened" construction of the operator definition "implies a level of control *over the hazardous substances at issue*" (emphasis in original)).

The method of determining operator liability does not just apply to corporate entities, but may also be used to impose operator liability on individuals. *See United States v. Jones*, 267 F. Supp. 2d 1349, 1355 (M.D. Ga. 2003) (noting that "[a]lthough *Bestfoods* involved the parent/subsidiary corporation relationship, the analysis has been applied in many cases to hold an individual shareholder or director liable under CERCLA if he himself operates a facility, rather than merely directs the business of the corporation"); *see also City of New York v. N.Y. Cross*

*Harbor R.R. Terminal Corp.*, No. 98-CV-7227, 2006 WL 140555, at *14 (E.D.N.Y. Jan. 17, 2006) (denying summary judgment against owner and CEO because there was an issue of material fact as to the depth of his "involvement in environmental compliance and hazardous waste disposal"); *City of Wichita, Kan. v. Trustees of the APCO Oil Corp. Liquidating Tr.,* 306 F. Supp. 2d 1040, 1055-56 (D. Kan. 2003) (finding corporation's president to be an operator based on his participation in weekly meetings that addressed environmental compliance issues and his approval of all decisions made at those meetings). Individuals found to be operators are "actively involved in decision-making concerning environmental compliance or hazardous waste disposal on a regular, ongoing basis." *N.Y. Cross Harbor R.R.,* 2006 WL 140555, at *13 (collecting cases). Conversely, "an individual officer or director who has only limited or sporadic involvement in environmental compliance issues or hazardous waste disposal cannot be considered an operator for CERCLA purposes." *Id.* (collecting cases).

The evidence is overwhelming that Cohen was the decision-maker at LAI, and that he was responsible for managing, directing, and conducting operations specifically related to storage and disposal of hazardous waste, and for making decisions about the extent of LAI's compliance with environmental regulations. As early as 1971, he participated in meetings and exchanged correspondence with the SCDHS regarding potential discharge violations at the LAI Facility. He attended inspections conducted by SCDHS and the EPA. He signed waste disposal permits and SPDES permits on LAI's behalf. He was the point of contact between LAI and the EPA. He took actions to prevent or limit the EPA's access to the site by refusing the request to remove hazardous materials on an emergency basis in 2003. He was present at the EPA's drilling operations and took his own samples to test independently. In 2009, he pled guilty to a federal crime, storage of hazardous waste material without a permit. Indeed, Cohen does not point to, nor is there any

evidence of, any other individual at LAI who made a single decision at the LAI Facility. Accordingly, the Court finds that Cohen was, and is, an operator under CERCLA.

At times during the trial and as part of his post-trial submissions, Defendants point to LAI's role as a Government contractor and argues LAI "was required to use [TCE] to clean parts manufactured for the Government, and therefore, should not be accountable by that very same Government." Defs' Resp. at 1. To the extent this suggestion is intended to impose liability on the Government as an additional "operator," it fails. There is no evidence whatsoever that the Government had any input on or control over the day to day operations of LAI or over how it handled hazardous materials. Cohen himself admitted that he was never instructed by the Department of Defense to spill TCE directly on the ground. Tr. 392. Thus, any attempt to shift CERCLA liability to the Government fails.

### 4. Costs Incurred

A defendant is responsible for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). The government may recover response costs if it proves "(1) there was a release or threatened release, which (2) caused incurrence of response costs, and (3) the defendant generated hazardous waste at the clean-up site." *United States v. Alcan Aluminum Corp. ("Alcan II")*, 990 F.2d 711, 721 (2d Cir. 1993)). In general, "response costs are liberally construed under" CERCLA." *W.R. Grace & Co.-Conn. v. Zotos Int'l, Inc.,* 559 F.3d 85, 92 (2d Cir. 2009). "[A]s 'many other courts have recognized, no factor of reasonableness or necessity of individual remedial costs is explicitly or implicitly required' for a governmental entity to recover costs incurred" under 42 U.S.C. § 9607(a)(4)(A). *New York v. Adamowicz,* 932 F.

Supp. 2d 340, 348 (E.D.N.Y. 2013) (quoting *United States v. E.I. du Pont de Nemours & Co.,* 341 F. Supp. 2d 215, 242 (W.D.N.Y. 2004) (internal quotations and citations omitted)

At trial, Defendants did not present any evidence to effectively challenge the Government's evidence of the costs incurred or the accounting methodology, nor did they question the accuracy of the invoice records maintained by the EPA. Upon a review of the testimony and exhibits and given Defendants' failure to contest the direct costs, the Court directs an award of direct costs in the amount sought.

Defendants have argued that the indirect costs sought should be disallowed because the testimony regarding these costs was "vague" and could not be specifically charged to a site. The Court is uncertain as to whether Defendants are challenging the appropriateness of an award of indirect costs in all cases or in just this one. As to whether indirect costs are available in general, courts take the statute at face value and interpret "all costs" to include indirect costs. *See, e.g., United States v. W.R. Grace & Co.,* 429 F.3d 1224, 1250 (9th Cir. 2005) (noting that "'[a]ll costs' include indirect costs such as administrative and other overhead costs incurred in managing the greater Superfund program"); *United States v. Dico, Inc.,* 266 F.3d 864, 878 (8th Cir. 2001) ("oversight and indirect costs are recoverable in remedial actions under CERCLA"); *United States v. R.W. Meyer, Inc.,* 889 F.2d 1497, 1504 (6th Cir. 1989) (statute contemplates award of full cost of cleanup including "a proportionate share of indirect costs attributable to each site"). Defendants have cited no case law for the proposition that indirect costs are not available. The Court finds that the indirect costs are recoverable as part of "all costs" within the meaning of CERCLA.

To the extent Defendants are challenging the award of indirect costs in this particular case, that argument also fails. The testimony on the calculation of direct versus indirect costs was cogent, understandable, and supported by documentary evidence. In brief, the EPA pools all the

indirect costs in a region, then allocates those costs to the sites in that region on a proportional basis. Rather than dividing the indirect costs equally between the sites in a region, this method leads to a larger, more expensive site bearing a larger, proportional share of the indirect costs. The indirect cost methodology has been evaluated by government and private accounting firms and has been found to be compliant with Standard 4. Defendants have provided no evidence or expert testimony to challenge the calculations made in this instance. The Government has established entitlement to an award of indirect costs as well.

Interest on amounts recoverable in a CERCLA action is recoverable, and accrues on the later of "(i) the date payment of a specified amount is demanded in writing, or (ii) the date of the expenditure concerned." 42 U.S.C. § 9607(a). The EPA seeks interest from the date of its demand for payment to LAI and Cohen, August 4, 2005. Accordingly, the Court awards the United States direct and indirect costs in the amount of $44,217,476.67 through December 21, 2016, plus interest in the amount of $3,898,547.64 for a total award of $48,116,024.31.

The EPA continues to incur response costs at the LAI Site for which LAI and Cohen are jointly and severally liable. The United States seeks a declaratory judgment "on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). That request is also granted.

5. <u>Response Costs and the National Contingency Plan</u>

As to the fifth factor requiring proof that the response costs conform to the National Contingency Plan, "[c]ourts presume that actions undertaken by the federal, or a state, government are consistent with the National Contingency Plan." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.,* 596 F.3d 112, 137 (2d Cir. 2010). To overcome such a presumption, a defendant must prove "inconsistency by showing that the State 'acted arbitrarily and capriciously in choosing

a particular response action.'" *Adamowicz,* 932 F. Supp. 2d at 344-45 (quoting *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 528 (2d Cir. 1996), *overruled on other grounds by New York v. Nat'l Servs. Indus.,* 353 F.3d 682, 685 (2d Cir. 2003)).  Here, the response costs sought were incurred by the Government to clean up the Site.  Defendants have not argued that the United States acted arbitrarily or capriciously with respect to the actions for which it seeks reimbursement of costs and thus have failed to rebut the presumption.  The Court finds that the response and costs conform to the National Contingency Plan.

## B.  Claims 4 and 5: Failure to Respond to Section 104(e) Request

In Claims 4 and 5, the United States, pursuant to CERCLA § 104(e), 42 U.S.C. § 9604(e), seeks an assessment of civil penalties on defendants LAI and Cohen for their failure to respond to duly-authorized requests for information.  Under that section, the EPA is authorized to require persons to provide information regarding: (1) "[t]he identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a . . . facility;" (2) "[t]he nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a . . . facility;" and (3) "[i]nformation relating to the ability of a person to pay for or to perform a cleanup."  42 U.S.C. § 9604(e)(2).  Liability pursuant to CERCLA section 104(e) may be imposed when the EPA issues an information request to a "person" within the meaning of CERCLA, for the purpose of determining the need for a response action under CERCLA or otherwise enforcing its provisions.  *See United States v. Ponderosa Fibres of Am., Inc.,* 178 F. Supp. 2d 157, 161 (N.D.N.Y. 2001)

The EPA's ability to use information letters to gather information is of great importance to its cleanup and enforcement mission.  *See, e.g., United States v. Gurley,* 235 F. Supp. 2d 797, 808 (W.D. Tenn. 2002) (finding the EPA's authority to solicit information from PRPs "essential");

*Ponderosa Fibres,* 178 F. Supp. 2d at 160 (calling the use of information request letters "the cornerstone of the Superfund enforcement program"). The imposition of a civil penalty also serves to deter conduct that obstructs the EPA's goals of removal and remediation. *See United States v. M. Genzale Plating, Inc.,* 807 F. Supp. 937, 939 (E.D.N.Y. 1992) (noting that the penalty under CERCLA's section 104(e) "give[s] effect to the major purpose of a civil penalty: deterrence").

The evidence establishes that on April 3, 2003, the acting Director of the EPA Emergency and Remedial Response Division sent a letter to LAI and Cohen notifying them that they were potentially responsible parties and attaching the Section 104(e) Request. LAI and Cohen did not provide a written response to the 104(e) Request. Although Cohen provided some limited responses during a deposition in December 2003, he failed to provide information regarding the location of releases of hazardous substances. In 2010, Cohen advised EPA officials for the first time of the disposal of TCE in a floor drain that was then filled with cement, a situation that would have been remediated sooner had Cohen timely complied with the request for information. Mindful of the goal of deterrence, the Court finds that Defendants' failure to provide written responses and their failure to provide specific information about the location of the release hazardous substances was unreasonable and is the basis for imposition of a civil penalty.

Determination of the amount of an appropriate civil penalty requires the Court to take into account several factors including the good or bad faith of the defendant, the injury to the public, the defendant's ability to pay, the desire to eliminate the benefits derived by a violation, and the necessity of vindicating the authority of the agency. *See Gurley,* 235 F. Supp. 2d at 806. Cohen's withholding of information regarding a known disposal site is evidence of bad faith and resulted in prolonged exposure and injury to the public and the expenditure of resources by the EPA that

could have been better more properly focused if it had possessed this information. Defendants' limited ability to pay, however, weighs against imposition of the maximum statutory penalty.[9]

CERCLA provides for the assessment of a civil penalty "not to exceed $25,000 for each day of noncompliance against any person who unreasonably fails to comply" with provisions regarding access to information, entry to the facility, inspection or the taking of samples, and/or an order directing compliance." 42 U.S.C. §9604(e)(5)(B). The maximum daily penalty has been increased to keep up with inflation and as of January 5, 2018, was set at $55,907. Civil Monetary Penalty Inflation Adjustment Rate, 83 FR 1190. The Court may exercise its discretion, and depending on the circumstances, "other courts have proposed penalties of $2,000, $1,000, $500, $75, and $55 per day" of noncompliance. *United States v. Timmons,* 03-CV-00951, 2006 WL 314457, at *17 (N.D.N.Y. Feb. 8, 2006) (citations omitted).

The Government claims that the period of time over which the daily penalty should be assessed runs from the date the response was due in 2003 until November 2010 when Cohen disclosed the location of the floor drain and the fact that TCE had been poured down it. Applying the statutory amounts, adjusted for inflation, the Government states that LAI and Cohen are liable for a maximum penalty of $91,117,500. It does not request this amount, however, instead suggesting a penalty against LAI and Cohen in the combined amount of $750,000, amounting to a daily penalty of approximately $275. The Court agrees that this amount properly considers the factors in this case and adequately serves as a deterrent. The Court finds in favor of the United States as to Claims 4 and 5, and imposes a civil penalty in the amount of $750,000 against LAI and Cohen, as to each respective claim.

---

[9] Information regarding Cohen's limited ability to pay was revealed at the sentencing hearing before Judge Hurley regarding the penalty for his environmental criminal conviction. *See United States v. Cohen,* 06-CR-0596, DE [67].

## C.  Claim 3:  *In rem* Claim

CERCLA provides for liens in favor of the United States government for unpaid response costs as follows:

> All costs and damages for which a person is liable to the United States under subsection (a) of this section . . . shall constitute a lien in favor of the United States upon all real property and rights to such property which—
>
> (A) belong to such person; and
>
> (B) are subject to or affected by a removal or remedial action.

42 U.S.C. § 9607(l)(1).  The statute provides that the lien arises at the later of (1) the time "costs are first incurred by the United States" in a CERCLA response action, or (2) the time the property owner is given "written notice of potential liability."  *Id.* § 9607(l)(4).

The Government has established that the six parcels of land are owned by LAI or Cohen, and that those parcels are subject to, or affected by, removal or remedial actions.  Letters providing notice of potential liability were dated after the EPA began incurring response costs and thus the liens arose at those later times.  As to LAI and its properties, Lots 19, 22, and 26, the liens arose on April 12, 2000, the date it was sent a notice of potential liability.  The notice of potential liability sent to Cohen was dated April 3, 2003, thus establishing the date the liens on Cohen's properties, Lots 1, 2, and 20, arose.

As to the priority of CERCLA liens over other liens, the CERCLA lien

> shall be subject to the rights of any purchaser, holder of a security interest, or judgment lien creditor whose interest is perfected under applicable State law before notice of the lien has been filed in the appropriate office within the State (or county or other governmental subdivision), as designated by State law, in which the real property subject to the lien is located.

42 U.S.C. § 9607(l)(3).  Notice of the EPA's liens were filed with the Suffolk County Clerk on March 6, 2003 for Lots 19 and 26, and on May 1, 2005 for Lots 1, 2, 20, and 22.

Each of the *In Rem* Claimants seeks to establish the priority of its liens against the proceeds of the sale of Defendants' assets.  Having determined that the United States has CERCLA liens against the parcels owned by LAI and Cohen, a determination of the competing claims appears to be necessary.  This issue, and the manner in which the Court would make such a determination, whether through trial or through motion practice, will be the subject of a conference to be held as set forth below.

## V.  CONCLUSION

For all the foregoing reasons, the Court finds in favor of the United States and against Defendants LAI and Cohen on Claims 1, 2, 4, and 5.   The United States is directed to prepare and submit a proposed Judgment consistent with the rulings in this Memorandum and Order.

The Court will hold a conference on April 10, 2019 at 2:30 PM in courtroom 920 of the Central Islip courthouse to address resolution of Claim 3.  By April 5, 2019, each party/claimant may file a brief letter, no longer than three (3) pages, regarding its position.

**SO ORDERED**.

_____/s/ (JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE

Dated: March 19, 2019
      Central Islip, New York